CLERKS OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED

JAN 24 2020

JULIA C. DUDLEY, CLERK
BY:  s/ MARTHA L. HUPP
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Danville Division

| | | |
|---|---|---|
| KRYSTAL H., on behalf of C.H.,[1] | ) | |
| a minor child, | ) | Civil Action No. 4:18-cv-00068 |
|       Plaintiff, | ) | |
| v. | ) | REPORT & RECOMMENDATION |
| | ) | |
| ANDREW SAUL, | ) | By:   Joel C. Hoppe |
| Commissioner of Social Security, | ) |       United States Magistrate Judge |
|       Defendant. | ) | |

Plaintiff Krystal H., on behalf of her minor son C.H., asks this Court to review the
Commissioner of Social Security's final decision denying the child's claim for supplemental
security income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381–1383f.
The case is before me under 28 U.S.C. § 636(b)(1)(B). ECF No. 11. Having considered the
administrative record, the parties' filings, and the applicable law, I cannot find that substantial
evidence supports the Commissioner's final decision. Accordingly, I recommend that the
decision be reversed and the case be remanded under the fourth sentence of 42 U.S.C. § 405(g).[2]

## I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final
decision that a person is not entitled to disability benefits. 42 U.S.C. §§ 405(g), 1383(c)(3); *see
also Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is
limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the
United States has recommended that, due to significant privacy concerns in social security cases, federal
courts should refer to claimants only by their first names and last initials. The Court always refers to
minors by their initials.

[2] I decline Krystal's request for oral argument, Pl.'s Br. 20, ECF No. 15, because the facts and legal
positions are adequately presented in the materials before the court and a hearing would not aid the
decisional process. *See* Fed. R. Civ. P. 78(b); W.D. Va. Gen. R. 4(c)(2). The Commissioner did not
request oral argument.

[its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, a court reviewing the merits of the Commissioner's final decision asks only whether the Administrative Law Judge ("ALJ") applied the correct legal standards and whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011); *see Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 98–100 (1991)).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review considers the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005); *see Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

## II. Legal Framework

A child is "disabled" within the meaning of the Act if he or she "has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i). Social Security ALJs follow a three-step process to determine if a child claimant is disabled. The ALJ

asks in sequence whether the child: (1) is working; (2) has a severe medically determinable

impairment; and, if so, (3) has an impairment or combination of impairments that meets,

medically equals, or functionally equals any of the disabling impairments listed in the Act's

regulations. *Bryant v. Barnhart*, 63 F. App'x 90, 92–93 (4th Cir. 2003); 20 C.F.R. § 416.924(a).[3]

     Step three has two parts. The ALJ must first consider whether the child's severe

impairment(s) meets or medically equals the criteria for any specific listed impairment. 20

C.F.R. §§ 416.925, 416.926; *see Sullivan v. Zebley*, 493 U.S. 521, 529–34 (1990). If it does, the

child "is conclusively presumed to be disabled and entitled to benefits." *Bowen v. City of N.Y.*,

476 U.S. 467, 471 (1986); *see* 20 C.F.R. § 416.924(d)(1). If it does not, the ALJ moves on to the

"functional equivalence" part of step three. 20 C.F.R. § 416.926a. This holistic, fact-specific

determination requires the ALJ to evaluate how appropriately, effectively, and independently the

child performs in "six domains" of functioning when compared to other children the same age

"who do not have impairments."[4] *Id.* § 416.926a(b)(1). To "functionally equal" the listings, the

child's medical impairment(s) must cause "marked limitation" in two domains or "extreme

limitation" in one domain.[5] *Id.* § 416.926a(d). The claimant bears the burden of proving that he

or she is disabled. *S.R. ex rel. R.R. v. Barnhart*, 371 F. Supp. 2d 796, 799 (W.D. Va. 2005).

---

[3] Unless otherwise noted, citations to the Code of Federal Regulations refer to the version in effect on the date of the ALJ's written decision.

[4] The six domains are: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for himself or herself; and (6) overall health and physical well-being. *Id.*

[5] A "marked limitation" means the "impairment(s) interferes seriously" with the child's "ability to independently initiate, sustain, or complete activities" compared to children the same age who do not have impairments. 20 C.F.R. § 416.926a(e)(2). An "extreme limitation" means the "impairment(s) interferes very seriously with [the] ability to independently initiate, sustain, or complete activities." *Id.* § 416.926a(e)(3). Although the "extreme" rating is reserved for "the worst limitations," it "does not necessarily mean" the child must demonstrate "a total lack or loss of ability to function" in a particular domain. *Id.* Additionally, the child's functioning may be sufficiently limited when his or her

### III. Procedural History

On October 16, 2014, Krystal filed for SSI alleging that her son, nine-year-old C.H., was disabled by a "[c]hronic motor tic disorder, learning disabilities in reading, writing, and math," and low intelligence quotient ("IQ"). *See* Administrative Record ("R.") 99, 190–98, ECF No. 9-1. C.H. was considered a "school-age" child until he turned twelve on October 28, 2016, and was considered an "adolescent" (ages 12 to 18 years) for the rest of the relevant period. *See* R. 89; 20 C.F.R. § 416.926a(g)(2)(iv), (v). Disability Determination Services ("DDS"), the state agency, denied his claim in January 2015, R. 98–106, and upon reconsideration that June, R. 107–16. In February 2017, Krystal appeared with counsel and testified at an administrative hearing before ALJ Karen Robinson. R. 48–49, 65–97. C.H. also testified at the hearing. R. 53–64.

ALJ Robinson issued an unfavorable decision on September 13, 2017. R. 11–25. She found that C.H. was a "school-age child" (ages 6 to 12 years) throughout the relevant period. R. 14 (citing 20 C.F.R. § 416.926a(g)(2)). C.H. had three "severe" medical impairments: a "learning disorder, attention deficit hyperactivity disorder ('ADHD'), and a sensory integration/tic disorder." R. 14. Next, ALJ Robinson found that C.H.'s medical records did not contain "objective findings of the necessary severity to meet or medically equal" the listings for childhood "neurocognitive" and "neurodevelopmental" disorders. R. 15 (citing 20 C.F.R. pt. 404, subpt. P, app. 1 §§ 112.02, 112.11). In particular, she found that while C.H. had "marked limitations with understanding, remembering, or applying information, he ha[d] only moderate limitations" interacting with others; maintaining concentration, persistence, or pace; and adapting

---

"impairment(s) limits only one activity or when the interactive and cumulative effects of [the] impairment(s) limit several activities" within a functional domain. *Id.* § 416.926a(e)(2), (3).

or managing himself in age-appropriate settings. R. 16–17 (citing 20 C.F.R. pt. 404, subpt. P,

app. 1 §§ 112.02(B), 112.11(B)).

ALJ Robinson then summarized parts of the record, R. 18–20, and evaluated C.H.'s

impairment-related functional limitations compared to other "school-age" children who do not

have impairments, R. 20–24. She found that while C.H. "undoubtedly ha[d] some limitations, the

record suggest[ed] that only his academic issues [were] as severe as alleged. Otherwise, he

function[ed] quite well, as evidenced by his daily activities and little need for treatment." R. 18.

More specifically, C.H. had "marked" limitation in "acquiring and using information," R. 21,

and "less than marked" limitations in "attending and completing tasks" and "interacting and

relating with others," R. 21–23.[6] Thus, ALJ Robinson concluded that C.H. was not disabled

between October 16, 2014, and September 13, 2017. R. 25. The Appeals Council declined to

review that decision, R. 1–5, and this appeal followed.

## IV. Discussion

Krystal argues that ALJ Robinson did not explain how she weighed conflicting evidence

about C.H.'s severe ADHD and tic disorder and the extent to which those impairments limited

the child's abilities to attend and complete tasks and interact and relate with others at an age-

appropriate level. *See generally* Pl.'s Br. 12–20. This argument is persuasive. It also exposes

another clear legal error: ALJ Robinson did not compare C.H.'s functioning in the domains *both*

to other "school-age children" *and* to other "adolescents" who do not have impairments. Instead,

she compared the (almost) thirteen-year-old boy's functioning to younger children (ages 6 to 12

years) who do not have impairments. *Cf. Ebony J. v. Saul*, No. 4:18cv32, 2019 U.S. Dist. LEXIS

---

[6] Krystal does not challenge the ALJ's other findings that C.H. had "less than marked" limitations in
"moving about and manipulating objects" and "caring for himself," and "no limitation" in "overall health
and physical well-being." R. 23–25; *see* Pl.'s Br. 11–20, ECF No. 15.

152404, at *21–29 (W.D. Va. Sept. 6, 2019) (recommending reversal and remand where ALJ made the same legal error), *adopted by* Order of Sept. 24, 2019 (W.D. Va.), ECF No. 21.

A.     *The Legal Framework*

ALJs use a technique called the "'whole child' approach" to determine whether a child's medical condition(s) functionally equals the listings. SSR 09-01p, 2009 WL 396031, at *1 (Feb. 17, 2009); *see* 20 C.F.R. § 416.926a. The ALJ "focus[es] first on the child's activities and evaluate[s] how appropriately, effectively, and independently [he] functions compared to children of the same age who do not have impairments." SSR 09-02p, 2009 WL 396032, at *1 (Feb. 18, 2009). After the ALJ "determine[s] how the child functions in all settings," and identifies which "activities are limited," the ALJ considers which "domains are involved in those activities." SSR 09-01p, 2009 WL 396031, at *2. "Domains are broad areas of functioning intended to capture all of what a child can or cannot do," *id.* at *1, both on a day-to-day basis and over time, *id.* at *9–10 & n.17. The ALJ must account for "the interactive and cumulative effects" of the child's medical impairment(s) and related symptoms[7] on his activities "in any and

---

[7] "Symptoms" are the claimant's own description of his or her medical condition. 20 C.F.R. § 416.928(a). "If the claimant is a child who does not describe, or cannot adequately describe, his [or her] symptoms, the ALJ will accept as a statement of [the child's] symptom(s) the description given by the person who is most familiar with [the child], such as a parent, other relative, or guardian." *Gerette v. Colvin*, No. 7:15cv12, 2016 WL 1254611, at *8 (W.D. Va. Feb. 2, 2016) (internal quotation marks omitted), *adopted by* 2016 WL 1296082 (W.D. Va. Mar. 30, 2016). The ALJ must follow the same two-step process to evaluate the caregiver's testimony about the child's medical condition, just as she would if the child claimant were testifying. *See id.*

"First, the ALJ looks for objective medical evidence showing a condition that could reasonably produce the alleged symptoms." *Lewis v. Berryhill*, 858 F.3d 858, 866 (4th Cir. 2017). Second, assuming the claimant clears the first step, "the ALJ must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit [his] ability," *id.*, to function at an age-appropriate level, 20 C.F.R. § 416.929(c); *see Gerette*, 2016 WL 1254611, at *8. "The second determination requires the ALJ to assess the credibility of [subjective] statements about symptoms and their functional effects," *Lewis*, 858 F.3d at 866, based on all the relevant evidence in the record. 20 C.F.R. §§ 416.924a, 416.926a, 416.929(c)(3). The ALJ must give specific, legally adequate reasons supported by "references to the evidence" for the weight assigned to the claimant's statements, *Edwards v. Colvin*, No. 4:13cv1, 2013 WL 5720337, at *6 (W.D. Va. Oct. 21, 2013), and, when necessary, she

all of the domains that [he] uses to do those activities, based on the evidence in the case record." *Id.* at \*2–3. Finally, the ALJ "rate[s] the severity" of the child's overall impairment-related limitation in each affected domain (e.g., "moderate," "marked," "extreme") to determine whether he is disabled. *Id.* at \*2.

"The critical element in [rating] the severity of a child's limitations is how appropriately, effectively, and independently the child performs age-appropriate activities," SSR 09-02p, 2009 WL 396032, at \*3, compared to the expected "functioning of other children the same age who do not have impairments," *id.* at \*11. *See* 20 C.F.R. §§ 416.924b(a), 416.926a(b). The ALJ should evaluate "the kind, extent, and frequency of help or adaptations the child needs," the settings where the child has trouble, including whether (and how often) the child needs a structured or supportive setting, and "all other factors [and evidence] that are relevant to" rating the child's limitations, SSR 09-01p, 2009 WL 396031, at \*3, considering his "chronological age" throughout the relevant time, 20 C.F.R. § 416.924b(a). *See L.D.R. by Wagner v. Berryhill*, 920 F.3d 1146, 1152–53 (7th Cir. 2019); *Rose v. Colvin*, No. 3:15cv2187, 2016 WL 3031853, at \*3–4 (N.D. Tex. May 26, 2016) (collecting cases). For most domains, the regulations list different skills or activities "that illustrate the typical functioning of children in [five] different age groups," [8] plus "examples of limitations within the[se] domains." 20 C.F.R. § 416.926a(b)(1). Because "the examples do not necessarily describe a 'marked' or 'extreme' limitation," however, the ALJ must "consider all of the relevant information in [the] case record" when rating the claimant's limitations compared to typical children within his age group(s). *Id.* § 416.926a(i)(3).

---

should "explain how he decided which of [those] statements to believe and which to discredit," *Mascio v. Colvin*, 780 F.3d 632, 640 (4th Cir. 2015).

[8] Those age groups are: "Newborns and young infants (birth to . . . age 1); older infants and toddlers (age 1 to . . . age 3); preschool children (age 3 to . . . age 6); school-age children (age 6 to . . . age 12); and adolescents (age 12 to . . . age 18)." SSR 09-01p, 2009 WL 396031, at \*1 n.7.

"There is no set formula" for deciding functional equivalence. SSR 09-01p, 2009 WL 396031, at *9–10. The "child's day-to-day functioning may be considered 'seriously' or even 'very seriously' limited whether [his] impairments impact only one activity or limit several activities" within a domain. *R.S. ex rel. Herrera v. Berryhill*, 357 F. Supp. 3d 1033, 1037 (C.D. Cal. 2019). Additionally, because "the effects of a child's impairments are considered" over time, the child can "have a 'marked' or 'extreme' limitation in a domain 'even though [he] does not have serious or very serious limitations every day.'" *Id.* (quoting SSR 09-01p, 2009 WL 396031, at *9). Determining whether the child has "marked" or "extreme" limitations "depends on the importance and frequency of the limited activities and the relative weight" of all available evidence. SSR 09-01p, 2009 WL 396031, at *9, *10 ("[T]he rating of limitation [in] a domain is not an 'average' of what activities the child can and cannot do."). The ALJ "must consider each piece of evidence in the context of the remainder of the case record" to get "a full picture of the 'whole child'" and his activities and functional limitations, SSR 09-02p, 2009 WL 396032, at *12 n.24, compared to other children in the same age group(s) who do not have impairments, 20 C.F.R. §§ 416.924b(a), 416.926a(b). The ALJ's decision itself should "provide sufficient detail" describing how she weighed that information so subsequent reviewers can understand why she made her findings. SSR 09-01p, at 2009 WL 396031, at *3.

B.    *Summary*

   1.    *Relevant Evidence*

Krystal alleged that her son's severe ADHD and chronic motor tic disorder caused serious problems with learning and using information, attending and completing tasks, and interacting and relating with others throughout the relevant period. *See* R. 65–95 (Feb. 2017); R. 201–09 (Nov. 2014); R. 276–80 (Jan. 2014); R. 312–14 (May 2014); R. 342–43 (Oct. 2014); R.

387–93 (June 2015); R. 439–40 (Jan. 2017); R. 455–56 (Apr. 2016); R. 459–60 (June 2014). C.H. was born in October 2004 after a relatively uncomplicated full-term pregnancy. R. 276, 391. He exhibited "some delays" developing language and fine motor skills, which were addressed with speech and occupational therapy. R. 276–77. Krystal started homeschooling all four of her children before C.H. entered kindergarten. *See* R. 90, 227–28, 276, 309, 313–14, 387, 391, 439. C.H. has never attended public or private school. R. 391. At age ten, he was enrolled in Boy Scouts and Awana, a religious-education program for children. R. 227, 232; *see* R. 71–73, 84.

In January 2014, C.H. saw Michole Pineda, M.D., and Lorie Bridges, R.N., at Carillion's Child Development Clinic in Roanoke. *See* R. 275–81, 285. Krystal expressed concern that C.H., age nine, did "not retain[] information"; had trouble focusing, regulating his emotions, interacting with others, and handling normal transitions; and was overly rigid with his belongings or routines. R. 276–78. C.H. said "that he also [did] something with his eyes" and demonstrated on exam "that he tended to look at the corner of his eyes." R. 276; *see* R. 280. Krystal described this as one of C.H.'s abnormal "repetitive behaviors." R. 277. Dr. Pineda observed that C.H.'s gestures and tone of voice did "not appear to be age appropriate." *Id.* He made eye contact, but it was "not where it should be for his age." R. 280. C.H. spoke in "somewhat" of a monotonous, "robotic tone even when he [was] happy or excited" and engaged in "limited" play during the office visit. *Id.* Dr. Pineda recommended that C.H. be evaluated for Autism Spectrum Disorder and undergo comprehensive psychoeducational testing by Gregory Robinson, Ph.D. *See* R. 280–81, 284–85, 287.

C.H. saw Dr. Robinson for testing twice in March 2014. *See* R. 284–307. He was "very friendly" and "easy to test" at both visits, and he consistently exhibited "appropriate" eye

contact, facial expressions, and social behavior. R. 289; *see also* R. 293. Dr. Robinson did not observe C.H. looking at him "from the corner of his eye[s]." R. 289. The "significant differences among [C.H.'s] cluster scores" on two standardized tests of ability and achievement, R. 293, met the diagnostic "criteria for Specific Learning Disorder in Reading, Mathematics, and Written Expression," R. 294; *see also* R. 309. His parents "thought the testing made sense." R. 309. Dr. Robinson encouraged them to share the results with their local "school system for educational eligibility determination, educational planning[,] and instructional purposes." *Id.* He also opined that C.H. "will need specialized instruction to address his significant problems with learning" if Krystal continued to homeschool him. *Id.*

Krystal and C.H. saw Dr. Pineda again on May 8, 2014. R. 311–16. Krystal "expressed dissatisfaction" with Dr. Robinson's evaluation "because she was hoping for specific recommendations other than to put him in school. . . . She did not get any recommendations other than to put him in school but was not told how it will serve him at all." R. 313. Dr. Pineda encouraged Krystal to think about hiring a tutor with "a background in special education" to help her teach C.H. at home. R. 314. Krystal was also "baffled" that Dr. Robinson did not diagnose C.H. with autism. *Id.* Dr. Pineda "told her that sometimes, those who are highly functional may not show" many autistic "characteristics until they are older and brought [in]to more challenging situations." *Id.* She offered to retest C.H. "in a year or so" after he was "more exposed to social situations." *Id.* C.H. acted "quite immature for his age" on that day's exam. R. 313. He was "somewhat figety," but "easily redirected" when prompted. *Id.*; *see also* R. 460 (occupational therapist's note that C.H. had "difficulty attending to tasks and staying on topic when asked a question," and "required frequent movement breaks to stay on topic" during a June 2014 evaluation). Krystal similarly reported that C.H. was "typically easily redirected when he gets

10

figety." R. 313. She did not have "much concern" about his behavior at that time. *Id.* C.H.'s

father was worried about the boy's tic, but it did not bother C.H. enough to consider medication

or therapy. R. 313–14.

C.H.'s chronic "repetitive motion with his head/eyes" became an issue in July 2014,

when "[h]e got in trouble at camp for 'eye-rolling,'" even though "he said he couldn't control it."

R. 330; *see also* R. 69 (Krystal testifying that camp personnel told her in the summer of 2016

that she "couldn't bring [C.H.] back because . . . he kept rolling his eyes" at them, which they

misinterpreted as C.H. being intentionally disrespectful). That October, Krystal took C.H. to see

Michael Sisk, M.D., a pediatric neurologist. R. 342–45. She wanted Dr. Sisk's second "opinion

about what seems to be a chronic tic disorder," but "said up front that she [was] not interested in

medical approaches" to managing C.H.'s symptoms. R. 342. Krystal described her son's tic as

"compulsive eye-blinking . . . sometimes involving his eyes rolling slightly and some mild facial

grimacing." *Id.* She thought it was more pronounced when C.H. was under stress or "strongly

concentrating on something." R. 342–43. Dr. Sisk noted C.H. was "friendly and interactive"

during the fifty-minute visit. R. 343. He observed "a few eye blinks with mild facial grimacing,"

but otherwise C.H. was "asymptomatic" in the office. *Id.* Dr. Sisk opined that C.H. did not need

treatment at that time, but he suggested "a trial of guanfacine should his tics 'get in his way.'" *Id.*

Krystal "made clear that she [was] not interested in psychostimulant treatment for any of her

children." *Id.*; *see also* R. 416 (Jan. 2015). By June 2015, C.H. was taking 1mg guanfacine at

night. R. 388; *see also* R. 232 (Mar. 2015).

Richard Stevenson, M.D., observed that C.H. exhibited "good" social interaction, social

awareness, and communication except for his "intermittent eye contact" during an exam on June

3, 2015. R. 389. Dr. Stevenson saw "a few tics of the eye rolling variety, looking to the left," but

he "did not see any complex head rolling tics" like the parents described. *Id.*; *see* R. 387

("Parents report multiple tics that include . . . eye rolls, head toss."). That July, Krystal told

William Wilson, M.D., that putting C.H. on medication had "reduced the frequency of the tics

from multiple episodes per day to about 5 times per day." R. 392; *see also* R. 390 ("[T]he family

feels that his vocal tics (exhalations, sniffing) [are] improved on the medication."). C.H.'s

neurophysical exam was normal. R. 393. In April 2016, Krystal reported that C.H., age eleven,

was studying at a third-grade level. R. 455. He was "involved in Boy Scouts weekly, and some

other activities," but he "sometimes ha[d] meltdowns" in those settings. *Id.*; *see also* R. 440 ("He

is in Boy Scouts, a church youth group, and is . . . playing basketball" (Jan. 2017)). C.H. still had

"multiple tics," including "eye rolls, head toss, sniffing, and excoriations." R. 455. Dr. Wilson

did not note any abnormalities on exam. *See* R. 455–56.

In January 2017, Krystal and C.H. returned to Dr. Sisk's office for the first time in two

years. R. 439. Krystal reported that she gave C.H. 1mg guanfacine "for a couple of months" in

early 2015 and had noticed "some" benefit, but that "she backed off of it" because "a lot of

things were going in [their] family at the time." *Id.* C.H.'s "main tics" were still "in and around

his eyes and face. He ha[d] compulsive eye blinking, eye rolling, exaggerated eye opening, and

sometimes squinting of his nose over the last year or so." *Id.* C.H. explained that the "eye tic

really bother[ed] him a lot when he [was] studying." *Id.* Krystal echoed C.H.'s complaint, noting

that it was mainly a problem "when she is doing one-on-one teaching with him[;] if he is really

concentrating the eye blinking becomes so severe that [C.H.] wants to back off" and take a

break. *Id.* C.H. also described "an inner urge" that he "must stretch his fingers" to relieve "an

odd feeling" or sensation between them. *Id.* This tic "really bother[ed] him." *Id.* Dr. Sisk

observed C.H. exhibit "a lot of eye blinking and eye rolling tics" during their fifty-minute visit.

R. 440. C.H. also showed Dr. Sisk "his finger stretching tic that he said gives him relief when he

feels tense." *Id.* Otherwise, he was friendly, interactive, and relaxed. *Id.* Dr. Sisk restarted C.H.

on 1mg guanfacine and instructed Krystal to double the daily dose in one week if C.H. tolerated

the medication well and she saw "a dramatic decrease in tics around the clock." *Id.*

    Krystal and C.H. both testified at the ALJ hearing in February 2017. C.H. was twelve

years old, R. 89, and in the fourth grade, R. 53–54. He should have been in sixth grade. R. 54.

C.H. demonstrated his eye and hand tics for ALJ Robinson at the beginning of the hearing. R.

54–55. The eye tic, where he blinked "really hard" and rolled his eyes, happened "very often." R.

55. He could stop the tic momentarily if he "shut [his] eyes really tight." *Id.* The hand tic, where

C.H. moved his fingers up and down because "it feels like there's something in between" them,

R. 54, frequently interfered with play, R. 55–56. *See* R. 70. He could focus on homework for

maybe "[a] couple of minutes" before his mind started to wander. R. 57. His mom or

grandmother often stepped in to get him back on task. *Id.* C.H. had one friend from church,

Gabe, with whom he spent time and got along well. R. 58 He did not see Gabe often, though. *Id.*

As for routine chores, C.H. was responsible for tidying, vacuuming, mopping "the living room

and hallway" in his family's trailer home. R. 58–60. He was supposed to do these chores "often,"

but "sometimes" he needed to be reminded. R. 59. He liked vacuuming, R. 60, and cleaning the

living room was easy because the family had "moved most of the stuff out of" there, R. 59. He

did not "really [mop] that often because [they] never get that far into it" before they "ha[d] to go

and do another thing." R. 60. C.H. also fought "a lot" with his siblings because he thought "stuff

should go in a particular place." R. 64; *see, e.g.*, R. 82–83 ("[H]e has about 50 stuffed animals

that we're not allowed to touch or get rid of, and they have to be in . . . [a] certain order on his

bed. . . . [H]e will randomly reorder them, and then put them back, and then reorder them, and

then put them back. . . . [H]e will spend an hour trying to get these [video] games lined up . . . [in

the] right order, and then if anyone else comes in and messes with it, he gets upset.").

Krystal described more extreme symptoms and limitations. She estimated that C.H.

experienced eye tics "anywhere from every 30 seconds to every two minutes." R. 65. The tics

were especially severe when he was under stress or "concentrating really hard" on something

else, like reading or playing basketball. R. 70–71. C.H. could "slow them down, . . . . [b]ut then

he's concentrating on just what his body is doing" and has a "hard [time] concentrating on

anything else." R. 70. Other kids teased him about his tics and learning disabilities, R. 69–72,

causing him to "lash[] out," R. 72. C.H. attended weekly scout meetings and church classes with

his siblings. *See* R. 71–72, 83–84, 87. He was "technically in Boy Scouts because he's old

enough," but troop leaders made accommodations to help him earn merit badges like the other

boys. R. 87. Krystal put C.H. in his younger brother's Awana class because he could not perform

at grade level. R. 71. He "seem[ed] to be doing better" in that setting, *id.*, but he still struggled to

memorize one scripture verse a week, R. 71–72, 84. C.H.'s rigid behavior also affected his

classmate's group lessons. R. 84 ("[E]very week he wants to be first or every week he needs to

be third, but he can't change up until he's ready to change up.").

Finally, Krystal described C.H.'s typical behavior at home and accommodations she

made to support him, including giving him "one-on-one" homeschool instruction for "two or

three" hours per day, seven days a week, all year around. R. 90–91. C.H. could focus for "maybe

five minutes" at a time when doing "something that he really like[d]." R. 81. Getting him to do

something he did not enjoy required frequent reminders and "constant" redirection. R. 80–81.

With vacuuming, for example, C.H. would "vacuum up a one foot by one foot section, stop, set it

down, and go [into] the kitchen." R. 80. Krystal would ask him to finish, C.H. would do "another

14

two foot section, and then . . . wander back to the bedroom." *Id.* She couldn't "just leave him with work to do because it w[ould] never get done." R. 91; *see* R. 86–89, 91, 95–96.

>    2.    *The ALJ's Decision*

ALJ Robinson referenced some of this evidence in briefly summarizing the record, R. 18–20 (citing R. 280–81, 285–94, 313, 343, 389, 440), and under the first three domains in her functional-equivalence assessment, R. 21–23. She credited C.H.'s test scores "document[ing] significant deficits in reading, mathematics, written language, and written expression," plus the fact that C.H. was "at least two years behind grade level in school," R. 20, in concluding that "only his academic issues [were] as severe as alleged," R. 18.[9] "However, since it appear[ed] his tic disorder and behavioral issues [were] not as severe as alleged," ALJ Robinson concluded that C.H. had "less than marked limitations with attending to and completing tasks" and "interacting and relating with others" compared to school-age children who do not have impairments.[10] R. 19. Indeed, contrary to Krystal's hearing testimony, she concluded that C.H. "function[ed] quite well, as evidenced by his daily activities and little need for treatment." R. 18; *see* R. 22 (daily activities). The ALJ rejected Krystal's testimony that C.H. was "easily distracted and require[d] constant redirection to do simple things like" like chores and homework, R. 18, because that

---

[9] ALJ Robinson cited the same evidence to support her findings that C.H had "marked limitations" understanding, remembering, or applying information overall, R. 16, and "marked limitations with acquiring and using in formation" compared to school-age children who do not have impairments, R. 19; *see* R. 20–21.

[10] "Attending and Completing Tasks" considers the child's ability to "focus and maintain" attention; "begin, carry through, and finish" activities; the pace at which the child performs activities; "the ease" with which he changes tasks or routines; and his capacities "to avoid impulsive thinking and . . . [to] prioritize competing tasks, and manage [his] time." 20 C.F.R. § 416.926a(h); SSR 09-4p, 2009 WL 396033, at *2 (Feb. 18, 2009); *see* R. 21.

"Interacting and Relating with Others" covers the child's ability to "initiate and sustain emotional connections" with familiar people, cooperate and comply with rules and social norms, respond to criticism, respect other people's belongings, and "respond to others appropriately and meaningfully." 20 C.F.R. § 416.926a(i); *see* R. 22.

allegation "contradict[ed]" her comment to Dr. Pineda in May 2014 that she did "not have much concern" about her child's behavior and "he is 'typically easily redirected when he gets fidgety,'" R. 19 (quoting R. 313).

Next, ALJ Robinson announced her findings about C.H.'s abilities and limitations, when compared to school-age children who do not have impairments, in the challenged domains:

> The claimant has less than marked limitation in attending and completing tasks.
>
> While the record documents some attention and concentration deficits, it does not support [Krystal's] testimony regarding the severity of his limitations. While he may require some redirection from time to time, which most children his age do, he is able to complete his tasks, like his chores, classwork, and homework. Also, like most children his age, he maintains better attention and concentration when doing things he enjoys, like playing video games or playing with his stuffed animals. Finally, in May 2014, [Krystal] admitted that he is "typically easily redirected when he gets fidgety."
>
> * * *
>
> The claimant has less than marked limitation in interacting and relating with others.
>
> While the claimant fights with his siblings, which is also typical for boys his age, and other children tease him about his tics, he gets along with his parents, spends time with his friend Gabe from church, and gets along well with his grandmother. He is also actively involved in the Boy Scouts and his church youth group and he plays on a basketball team, all of which require[] some socialization skills. Finally, every physician . . . ha[s] described him as friendly, alert, cooperative, and interactive, and during a consultative examination in June 2015, he displayed "good" social interaction, social awareness, and communication.

R. 21–23 (citation omitted).

ALJ Robinson did not mention evidence that C.H. had always been homeschooled, R. 391, 439, and Krystal spent at least two hours a day, seven days a week, giving him "one-on-one" instruction, R. 90–91; that C.H. spends hours compulsively organizing his video game boxes and stuffed animals, R. 82–83; that he received accommodations in Boy Scouts and did not fully participate in the youth group, despite being placed with younger children, *see* R. 71–72, 84, 87; that C.H. did not see Gabe very much, R. 58; or that C.H.'s occupational therapist

16

noticed he had "difficulty attending to tasks and staying on topic" and "required frequent"

reminders or breaks during several sessions in 2014, R. 460; *see also* R. 463–65, 467. She also

recognized that C.H. turned twelve before the hearing, *see* R. 89, but there is no indication that

she compared his functioning in these domains *both* to school-aged children, "i.e., . . . age 6 to

*the attainment of* age 12," R. 20 (emphasis added), *and* to "adolescents," i.e., ages 12 to 18, who

do not have impairments, 20 C.F.R. § 416.926a(g)(2)(v).

C.    *Analysis*

    "A claimant's age is 'an important factor' in determining functional equivalence." *Artis v.*

*Colvin*, No. 5:15cv119, 2016 WL 937703, at *6 (E.D.N.C. Feb. 25, 2016) (quoting 20 C.F.R. §

416.924b(a)), *adopted by* 2016 WL 953258 (E.D.N.C. Mar. 11, 2016). Indeed, it is the primary

"reference point," *Smith ex rel. Q.D.S. v. Berryhill*, No. 3:17cv411, 2018 WL 3373507, at *2

(N.D. Ind. July 11, 2018), both for determining "how the child functions . . . compared to other

children the same age who do not have impairments," SSR 09-01p, 2009 WL 396031, at *2, and

for rating the severity of the child's limitations in the domains compared to his "same-age peers

who do not have impairments," *id.* at *6. *See* 20 C.F.R. § 416.926a(b)(3). For most domains, the

regulations provide "a 'general' description of the types of activities that make up the domain

and a more specific description labeled 'age group descriptors.'" *Smith*, 2018 WL 3373507, at

*2. The specific descriptions "break down the activities that children [in five] defined age groups

should be able to accomplish." *Id.* Children who do not have impairments are expected to

manage increasingly advanced or complex activities and skills as they grow older. *See id.*, at *2–

3; *Kline ex rel. J.H.-K. v. Colvin*, No. 11 C 50376, 2014 WL 69953, at *16 (N.D. Ill. Jan. 9,

2014); *Butler ex rel. J.B. v. Colvin*, No. CA 12-382, 2013 WL 1007717, at *1 n.3 (S.D. Ala. Mar.

13, 2013). Thus, if the ALJ "compared the child to the wrong age group" when rating the

severity of his impairment-related limitations in the domains, the ALJ's "determination would be fundamentally flawed." *Tisdale ex rel. B.O.H. v. Astrue*, No. 8:07cv862, 2008 WL 4145838, at *3 (M.D. Fla. Sept. 8, 2008); *see Butler*, 2013 WL 1007717, at *3 n.7 ("[I]f the age descriptors meant nothing, the regulations would not make any age distinctions.").

Here, ALJ Robinson compared C.H.'s functioning only to typical "school-age" children even though C.H. was twelve years, eleven months old (an adolescent) when the ALJ issued her decision. She did cite testimony and treatment notes from after C.H.'s twelfth birthday when rating his limitations completing tasks and interacting with other people, R. 21–23, but she did not explicitly "consider[] this evidence in light of the appropriate functioning," *Artis*, 2016 WL 937703, at *6, of a typical adolescent in either domain. *Compare A.M. v. Colvin*, No. 4:15cv129, 2016 WL 1060366, at *9–11 (E.D. Mo. Mar. 17, 2016) (reversing and remanding where ALJ compared child only to other school-age children even though he "reached adolescence approximately one month before" the ALJ issued his decision), *with L.D.R.*, 920 F.3d at 1152–53 (affirming where ALJ "describ[ed] the typical functioning of children in each of the three age categories applicable to [the child] for every domain" and explained how he considered evidence from "each of the relevant age ranges"). "Thus, from all that appears, the [ALJ], in finding that [C.H.] did not have marked limitations"—and in rejecting Krystal's testimony describing serious limitations—"compared the [preteen's] functioning to children of a *younger* age group," *Tisdale*, 2008 WL 4145838, at *3 (emphasis added). *See* R. 21–23.[11]

Federal district courts have held that this legal error warrants reversal and remand, *see, e.g.*, *A.M.*, 2016 WL 1060366, at *9–11; *Rose*, 2016 WL 3031853, at *3–4; *Butler*, 2013 WL

---

[11] The Commissioner does not mention the ALJ's error in his brief, and therefore does not argue that the error was harmless. *See generally* Def.'s Br. 9–14, ECF No. 19. Below, I explain why "the ALJ's error may have materially affected the analysis and, thus, requires remand." *Artis*, 2016 WL 937703, at *6.

1007717, at *3; *Tisdale*, 2008 WL 4145838, at *3, for two reasons. First, adolescents are

expected to be more advanced and independent than school-age children. *See Bucha v. Comm'r*

*of Soc. Sec.*, No.1:15cv1174, 2016 WL 5340271, at *3–4 (W.D. Mich. Sept. 23, 2016). Even if

C.H. did not have "serious" or "very serious" problems staying on task or socializing compared

to typical elementary schoolers, *see* R. 21–22, his record contained evidence that may establish

marked limitations in either domain when compared to teenagers who do not have impairments,

*see, e.g.*, R. 71–72, 82–84, 87, 90–91, 391, 439. For example, children ages twelve to eighteen

"should be able to pay attention to increasingly longer" and complex writings, presentations, and

discussions; stay on "task for extended periods of time" without being "unduly distracted" by

their by peers or "unduly" interfering with others' work; and independently manage their time to

complete chores and assignments. 20 C.F.R. § 416.926a(h)(2)(v). School-age children, on the

other hand, still need some "reminders and accommodation" to do these things. *Id.* §

416.926a(h)(2)(iv); *see* R. 21–22. Adolescents also "should be able to initiate and develop

friendships with children [their own] age," "relate appropriately to other children and adults,

both individually and in groups," "intelligibly express [their] feelings" or ask for help, and

understand how "to solve conflicts" with peers, family, and adults outside the family. 20 C.F.R.

§ 416.926a(i)(2)(v). School-age children are only beginning to learn these social skills. *See id.* §

416.926a(i)(2)(iv). ALJ Robinson mentioned some of the evidence relevant to these examples, R.

18–19, but it appears her findings that C.H. had "less than marked" limitations were erroneously

based on what the regulations expect from younger, less mature children, R. 21–23. *Smith*, 2018

WL 3373507, at *2–3; *Artis*, 2016 WL 937703, at *6; *Rose*, 2016 WL 3031853, at *3–4; *Tisdale*,

2008 WL 4145838, at *3.

Second, reviewing courts cannot "engage[] in an analysis that the ALJ should have done in the first instance," or speculate about how the ALJ might have ruled had she properly applied "'the pertinent legal requirements to the record evidence.'" *Fox v. Colvin*, 632 F. App'x 750, 754—55 (4th Cir. 2015) (quoting *Radford v. Colvin*, 734 F.3d 288, 295 (4th Cir. 2013)); *see also Patterson v. Comm'r of Soc. Sec. Admin.*, 846 F.3d 656, 662–63 (4th Cir. 2017). ALJ Robinson neither compared C.H.'s functioning to other adolescents who do not have impairments nor explained how she weighed relevant conflicting or inconsistent evidence under that correct standard of comparison. Thus, because I "cannot gauge the propriety" of the ALJ's functional-equivalence assessment, I "cannot say that substantial evidence supports" the denial of benefits, *Patterson*, 846 F.3d at 662, in this case. *See Ebony J.*, 2019 U.S. Dist. LEXIS 152404, at *28–29 (citing *A.M.*, 2016 WL 1060366, at *10–11).

Moreover, I share Krystal's concern that ALJ Robinson's credibility analysis "failed to build an 'accurate and logical bridge' from the evidence to [her] conclusion that [C.H.] ha[d] less than marked limitations" in the challenged domains. *Tameisha M. o.b.o. T.M. v. Berryhill*, 340 F. Supp. 3d 573, 578 (W.D. Va. 2018) (quoting *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018)); *see* Pl.'s Br. 15–20. For example, ALJ Robinson did not explain how she determined C.H. was "actively involved" in the Boy Scouts and his church youth group or that he could "complete . . . his chores, classwork, and homework" with minimal, age-appropriate redirection. R. 21–22. C.H. and Krystal testified that he needed adult supervision and one-on-one support to stay on task, particularly when it came to schoolwork, R. 81, 86–91, 95–96. Krystal reported C.H. was "involved in Boy Scouts" on a weekly basis, but that he received accommodations in order to participate in his age group and "sometimes ha[d] meltdowns" in that setting. R. 455; *see* R. 440. C.H. struggled to stay on task and regulate his behavior in the church youth group

even though Krystal put C.H. in his younger brother's class, R. 71–72, 83–84, 87. *See Woods*,
888 F.3d at 694 ("An ALJ may not consider the *type* of activities a claimant can perform without
also considering the *extent* to which [he] can perform them."). If ALJ Robinson rejected those
allegations, which it appears she did, then her specific reason(s) for doing so "must be grounded
in the evidence and articulated in the . . . decision." *Eggleston v. Colvin*, No. 4:12cv43, 2013 WL
5348274, at *4 (W.D. Va. Sept. 23, 2013). She could not reject that evidence simply because she
did not believe it. *See id.*

I take no position on whether C.H. is entitled to disability benefits for the relevant period.
On remand, the Commissioner must consider and apply the correct legal rules to all the relevant
evidence in the record, explain how any material inconsistencies or ambiguities were resolved at
each critical stage of the disability determination process, and provide an accurate, logical
description of how specific evidence supports each conclusion in his functional-equivalence
assessment. *See Bryant*, 63 F. App'x at 90, 94–96; *Ebony J.*, 2019 U.S. Dist. LEXIS 152404, at
*29; *Elsie L. v. Berryhill*, No. 4:17cv50, 2018 WL 6981223, at *8 (W.D. Va. Dec. 4, 2018),
*adopted by* 2019 WL 137617 (W.D. Va. Jan. 8, 2019).

## V. Conclusion

For the foregoing reasons, I respectfully recommend that the presiding District Judge
**GRANT** the Plaintiff's Motion for Summary Judgment, ECF No. 14, **DENY** the
Commissioner's Motion for Summary Judgment, ECF No. 18, **REVERSE** the Commissioner's
final decision, **REMAND** the matter for further administrative proceedings under the fourth
sentence of 42 U.S.C. § 405(g), and **DISMISS** this case from the Court's active docket.

## Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the Honorable Jackson L. Kiser, Senior United States District Judge.

The Clerk shall send certified copies of this Report and Recommendation to all counsel of record.

ENTER: January 24, 2020

Joel C. Hoppe
United States Magistrate Judge